UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JEROLD R. PARKS,                    )
                                    )
                Plaintiff,          )
                                    )
        vs.                         )        Case No.  2:05CV17 AGF
                                    )
JO ANNE B. BARNHART,                )
Commissioner of Social Security,    )
                                    )
                Defendant.          )


**MEMORANDUM AND ORDER**

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security, denying Plaintiff Jerold Parks's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-

434 and supplemental security income ("SSI") under Title XVI of the Act, 42. U.S.C.

§§ 1381-1384f.[1]  For the reasons set forth below, the Court will reverse the decision of

the Commissioner and remand the case for further consideration.

Plaintiff, who was born on February 12, 1958, applied for benefits on February 25,

2003, alleging a disability onset date of October 1, 1996, due to a learning disability,

possible brain damage at birth, high blood pressure, high cholesterol, and diabetes.  Tr. at

62.  Following a hearing on April 14, 2004, an Administrative Law Judge ("ALJ") found

on July 28, 2004, that Plaintiff was not disabled.  The Appeals Council of the Social

_____

[1]    The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

Security Administration declined to review the ALJ's decision. Plaintiff has thus exhausted all administrative remedies and the ALJ's July 28, 2004 decision stands as the final agency action.

Plaintiff argues that the ALJ erred in finding that Plaintiff could perform his past relevant work. Specifically, Plaintiff argues that the ALJ failed to afford substantial weight to the opinion of Plaintiff's treating physician, and instead afforded substantial weight to the opinion of a non-examining, non-treating consultant.

**BACKGROUND**

**Work History**

Plaintiff self-reported his work history when he applied for benefits. He wrote that he was employed as an assembly worker at Toastmaster from 1979 to 1982; as an errand boy at Driver's Edge, an auto repair shop, for seven months in 1990; full-time as an assembly worker at Toastmaster for three months in 1995, earning $5 per hour; full-time as a laborer at a rubber recycling plant in 1995, earning $5 per hour; part-time as a security guard for the Housing Authority from 1997 to 2002, earning $250 per month; and part-time as an assistant (running errands and making deliveries) at Macon Custom Computers from 1999 to 2002, earning $100 per week. Tr. at 63, 69. At the time of the hearing, Plaintiff was working at a sheltered workshop. Tr. at 195.

**Vocational Records**

On several occasions in January through April 2003, Learning Opportunities/Quality Works, Inc. ("LOQW") placed Plaintiff for one day at various

employment sites to evaluate his performance. On January 24, an assessor noted that Plaintiff owned a reliable car, had the physical strength to stock shelves but could not lift excessively or repetitively due to a back injury, took longer to do tasks than others, which was probably due to unfamiliarity with the location, and learned best through verbal instruction. The evaluator also noticed that Plaintiff did not display difficulties in communication, was properly groomed, and did not seem to need help staying on task. Tr. at 126-32.

On February 4, 2003, Plaintiff's employment skills were evaluated by LOQW during a placement at a grocery store. The assessor reported that Plaintiff was well-groomed, had no physical trouble stocking shelves, understood directions, but was forced to repeat himself because he sometimes garbled his words. The assessor observed that Plaintiff did not need much prompting to finish tasks, and reported that Plaintiff's "dream job would be something with computers." Tr. at 133.

On February 6, 2003, LOQW assessed Plaintiff's ability to work in the electronics department of a Wal-Mart. The assessor recounted that Plaintiff was well-groomed, was able to stock, face, and clean products, and verify prices without limitations, and did not require extra breaks. Tr. at 134. On February 13, 2003, Plaintiff was assessed while working at a local internet provider. LOQW reported that Plaintiff was well-groomed and understood the language of computers, but needed training to do this type of work. Tr. at 135. On February 26, 2003, LOQW recommended that Plaintiff "pursue full time

employment in the field of his choice. Computers or data entry type position would best suit [Plaintiff]." Tr. at 132.

On April 8, 2003, Plaintiff's former manager at the Housing Authority completed an employer questionnaire regarding Plaintiff's work as a security guard. The manager reported that Plaintiff did an adequate job, received no special considerations, and was dependable, but had a problem with personal hygiene and would wear the same clothes for days. Tr. at 80.

**Medical Records**

In treatment notes dated November 27, 2002, Cari Worley, M.D., Plaintiff's treating physician, wrote that Plaintiff had a history of hypertension, diabetes, and elevated cholesterol. Dr. Worley increased Plaintiff's diabetes and hypertension medication. Tr. at 113. On December 11, 2002, Dr. Worley diagnosed Plaintiff with gastroesophageal reflux disease, and noted that medication had improved Plaintiff's blood pressure. Tr. at 109. On February 12, 2003, Dr. Worley stated that Plaintiff also had signs of microalbuminuria (protein in urine). Tr. at 92.

On March 18, 2003, Sandra Loughlin, Ph.D., a licensed psychologist and Plaintiff's cousin, sent a letter to the state disability determinations agency. Dr. Loughlin opined that Plaintiff met criteria for fetal alcohol syndrome, and that his brain damage was confirmed by testing which was conducted when he was about six years old. Dr. Loughlin wrote that Plaintiff was in special education classes throughout his education, and had significant learning disabilities. It was her understanding from her uncle's

children that the jobs Plaintiff had over the years were due to his uncle's influence and standing in the community. Dr. Loughin also stated that Plaintiff had been taken advantage of by others, had never shown social maturity or judgment, never had a checking account, and had his bills paid for by his mother until her death one month prior (and several weeks before Plaintiff filed for benefits). Dr. Loughlin offered her professional observations that Plaintiff functioned at the approximate level of a 15 or 16 year old, and had poor impulse control, concentration, focus, hygiene, and adaptability. According to Dr. Loughlin, Plaintiff had difficulty with abstract thinking, and needed guidance to remain on task for any length of time. In addition, she stated that Plaintiff was unable to manage his finances, and was physically limited by his diabetes. Tr. at 119-20.

On May 15, 2003, psychologist James Tichenor, Ph.D., evaluated Plaintiff in connection with his application for benefits. Dr. Tichenor reported that Plaintiff drove himself and a friend to his appointment, arrived on time, and was groomed appropriately with adequate hygiene. Dr. Tichenor stated that Plaintiff occasionally stumbled on his words, but had normal speech quantity and did not exhibit significant speech articulation difficulty. Dr. Tichenor observed that Plaintiff was easily flustered and lost his train of thought, mildly to moderately impairing his attention and concentration. But Plaintiff's thought processes were logical and his affect consistent and appropriate, although he seemed anxious. Dr. Tichenor concluded that Plaintiff's insight and judgment were

"likely to be marginally adequate for him to be able to manage money and make significant decisions in life."  Tr. at 136.

Dr. Tichenor administered a Weschler Adult Intelligence Scale (3rd ed.) (WAIS-III) IQ test and concluded that Plaintiff had low-average general intellectual functioning with a verbal IQ of 83 (low average), performance IQ of 98 (average), and full scale IQ of 89 (low average).[2]  His abstract thinking was above-average, but Dr. Tichenor noted deficits in Plaintiff's ability to attend to, retain, and process information efficiently. Although Plaintiff demonstrated a relative strength in verbal conceptual thinking, Dr. Tichenor found Plaintiff significantly below average in the arithmetic and performance fields, suggesting poor numerical reasoning, poor manipulation speed, poor concentration, poor visual-motor speed, and poor coordination.  Tr. at 137.

Dr. Tichenor opined that Plaintiff's functional capacity was likely to be greater if he were not under time or social pressures; and that Plaintiff appeared to find it very difficult to keep on track when asked to solve problems which required short-term memory retention, and to understand and remember instructions with more than two steps.  He opined that Plaintiff would not be able to sustain concentration and persist at tasks in a normal competitive work environment, and that his ability to interact socially and adapt to his environment was limited, although not precluded.  Tr. at 137.

---

[2]  The WAIS-III classifies IQ scores within the 70-79 as borderline; within the 80-89 range as low average; and within the 90-109 range as average.

On May 21, 2003, another consulting, but non-examining psychologist, Mark Altomari, Ph.D., completed a Psychiatric Review Technique form regarding Plaintiff. Dr. Altomari indicated that Plaintiff had moderate limitation in activities of daily living and social functioning; mild limitation in maintaining concentration, persistence, or pace; and no episodes of decompensation. Taking Dr. Loughlin's letter and Dr. Tichenor's evaluation into account, Dr. Altomari concluded that Plaintiff could return to past work as a night watchman, and that Plaintiff's claim that he had a cognitive disorder was fully credible. Tr. at 153-55.

On the same day, Dr. Altomari completed a mental residual functional capacity ("RFC") assessment. He indicated that Plaintiff was moderately limited in the ability to understand, remember, and carry out detailed instructions; work in coordination with/proximity to others without being distracted; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic hygiene standards; and respond appropriately to changes in the work setting. Dr. Altomari concluded that Plaintiff would require a "relatively isolated work situation," may need extra supervision when adapting to a new work routine, and could make simple work-related decisions. Tr. at 157-59.

On May 22, 2003, Paula Scott, a non-medical "senior counselor" with the state disabilities determination agency, completed a physical RFC assessment of Plaintiff based upon her review of the file. She found that Plaintiff's primary diagnosis was diabetes, and secondary diagnoses was hypertension. She noted that Plaintiff also alleged

that his obesity and high cholesterol were disabling impairments. Ms. Scott indicated in check-box format that Plaintiff had no exertional, postural, manipulative, and visual limitations, but that he should avoid concentrated exposure to hazards such as machinery or heights. Ms. Scott concluded that the severity of the alleged symptoms was disproportionate to Plaintiff's medically determinable impairments. Tr. at 161-66.

Dr. Worley, Plaintiff's treating physician, completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) on April 1, 2004. Dr. Worley indicated that Plaintiff could frequently lift up to ten pounds, occasionally lift from 11 to 20 pounds, continuously carry ten pounds, and frequently carry 11 to 20 pounds. He could sit for eight hours, stand for five hours, and walk for two hours in an eight-hour work day. Dr. Worley indicated that Plaintiff could never balance; could occasionally climb, crouch, kneel, and crawl; and could frequently stoop. She also warned Plaintiff to avoid concentrated exposure to extreme temperatures, due to his obesity. Dr. Worley noted that Plaintiff's diabetes, blood pressure, and cholesterol had improved with medication. Tr. at 173-77.

Dr. Worley also completed a Medical Assessment of Ability to Do Work-Related Activities (Mental) on April 1, 2004. She indicated that Plaintiff had poor ability to relate to co-workers, deal with the public, use judgment, deal with work stress, and maintain concentration, and fair ability to follow work rules, interact with supervisors, and function independently. Dr. Worley stated that Plaintiff appeared to have mild cognitive impairment, although she did not have IQ tests to verify this. Tr. at 179-80.

The record also contains a one-page hand-written, undated, and unsigned evaluation of Plaintiff's functional impairments in the areas of judgment and decision-making. This evaluation appears to be in Dr. Worley's handwriting. The writer opined that Plaintiff operated at a 15 to 16 year old emotional level, had severely impaired abilities to assess and manage money, as he had given a lot of it away, and had poor impulse control and hygiene. Tr. at 117.

**Evidentiary Hearing of June 10, 2004**

Plaintiff, who was represented by counsel, testified that he was born on February 12, 1958, and completed the 12th grade. He stated that he had lived by himself for the last seven years, had a driver's license, and drove three to four times a week. He said that he had been working at a sheltered workshop for about six months, making $2.50 to $3.00 an hour when there was work to be done, and $.52 an hour when there was no work. He stated that he worked six hours a day, five days a week. He said that he did not have to lift anything heavier than ten pounds at the workshop, and that the job had been going well. Plaintiff testified that from 1997 to 2000, he worked as a night watchman, earning $250 per month. He stated that he worked eight to 12 hours per week at that job. He also said he used to work at Custom Computers on a full-time basis, answering the phone and running errands. He did not specify when or for how long he held this job. Tr. at 193-96.

When asked if he could think of a full-time job he could perform, Plaintiff responded, "I don't know." Tr. at 196. Plaintiff testified that he had occasional pain in

his back and right knee.  He stated that he had type II diabetes, and took a pill two times a day to treat it.  He also said that he was supposed to avoid fatty and greasy foods, but sometimes he ate those kinds of foods.  Plaintiff testified that he used to smoke a pipe, but he quit in the early 1990's, and that he currently drank alcohol two times a month.  He stated he did not use illegal drugs.  Tr. at 196-97.

Plaintiff testified that he watched TV and played computer games when he was not working.  He stated that he used the Internet to find information about Star Trek, Star Wars, custom cars, and motorcycles.  He said he played computer games, and that he was average at the games.  He estimated that he watched TV two to three hours a day, and stated that he liked science fiction and comedy shows.  Tr. at 197-99.

Plaintiff stated that he lived in a basement apartment, and that he had to walk down 21 steps to get to his apartment.  He testified that he used the steps two to three times daily.  Plaintiff said he did not engage in social activities outside his home, but that he did go to gatherings at a friend's house.  He testified that he enjoyed using CB radios, and had one in his car.  Plaintiff claimed he could do basic grooming and household tasks such as dressing, bathing, laundry, and cooking, and that he went shopping once a week. Tr. at 199-202.

Plaintiff testified that he flew to Maryland to visit his brother for two weeks in 2003.  Plaintiff told the ALJ that while there, he visited the Air and Space Museum and the Natural History Museum in Washington, D.C.  He also drove to Branson, Missouri, more than once, most recently in 2001.  Tr. at 202-04.

Plaintiff stated that he took prescription medicines but did not specify why he took them, and said that he had not experienced side effects from them. He testified that his address was 474 South Missouri, Apartment 122. He said his eyes were getting worse due to his diabetes, that the prescription for his glasses had changed twice in the last several years, and that he currently wore bifocals. Plaintiff testified that he had been told he was a premature baby, and was not breathing when he was born. He also said that he had six toes on each foot when he was born, and that the extra toes had been removed. He stated that he was born cross-eyed, and had surgery to correct that condition as well. Tr. at 204-07.

Plaintiff testified that he was in special education classes throughout his education. He stated that he worked on the factory line at Toastmaster, and was fired for poor performance. He said that he was rehired and transferred to the metal-stamping department, and that he kept that job but was only performing at 75 to 80 percent of his expected quota. He said he was eventually laid off, giving no reason for this. Tr. at 208-10.

Plaintiff said that sometimes he had problems reading, and could do simple math such as addition and subtraction, but that it took him a long time. He testified that he became stressed when he was unable to meet his quotas while working at Toastmaster. He said that at the sheltered workshop, there were no quotas to meet. Plaintiff stated that when he worked as a night watchman, Social Security deductions were not taken from his checks. He said that he learned to do simple tasks on the computer when he worked at

the computer store, and that there were no time restrictions when he did such tasks. He testified that it took him about four years to prepare to take the driver's license test, and that someone always accompanied him when he went sightseeing in Washington, D.C. Tr. at 210-13.

Plaintiff testified that he worked at a rubber recycling plant in 1995. He said that the heaviest item he lifted at that job weighed 20 or 25 pounds. A vocational expert ("VE") then recounted the skills Plaintiff acquired from his past jobs. The VE said that Plaintiff could observe and report difficulties as a result of the night watchman job and could use small tools and had experience in the factory assembly process as a result of the Toastmaster job. Tr. at 215-16.

The ALJ asked the VE to assume a hypothetical worker who had the same age, education and relevant work experience as Plaintiff. First, the ALJ asked if the worker could perform any of Plaintiff's past work if he could not work near hazards such as dangerous machinery and unprotected heights; and had "moderate limitations" (which the ALJ defined as "somewhere between not significantly limited and markedly limited") in the abilities to understand, remember, and carry out detailed instructions; work in coordination or in proximity to others without being distracted by them; interact appropriately with the general public; respond appropriately to changes in the work setting; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. The VE responded that Plaintiff's past job at the rubber recycling plant could be performed with the given limitations. Tr. at 217-18.

The ALJ then asked the VE if there were any other unskilled, semiskilled, or skilled, simple, repetitive-task, entry-level, low-stress, jobs with limited public contact, that the hypothetical worker could do. The VE replied that a small products assembler, hand packer, and laundry worker fit that job description. The VE testified that there were 4,500 small products assembler positions, 8,000 hand packer positions, and 2,000 laundry positions in Missouri, Nebraska, and Iowa. Tr. at 217-19.

The second question that the ALJ asked the VE was whether there were any jobs a worker could do if he had the same vocational factors and limitation on working around hazards as in the first question, plus a poor ("seriously limited but not precluded") ability to deal with work stress; work with co-workers or supervisors; respond to normal changes in the work setting; deal with the public; understand, remember and carry out even simple job instructions; maintain attention and concentration in the work place; and respond in an appropriate manner to challenges in the workplace. The VE stated that no such jobs exist. Tr. at 219-20.

Plaintiff's attorney then asked the VE what jobs were available for a worker with the added (presumably to the individual in the first hypothetical) restrictions of poor ability to work under time-pressured situations, low efficiency abstract thinking capabilities, difficulty keeping on track, was easily confused when asked to solve problems requiring maintenance of short-term memory, and had the inability or difficulty to understand instructions involving more than two steps. The VE responded that there were no such jobs. Tr. at 220-21.

13

**ALJ's Decision of July 28, 2004**

The ALJ held that Plaintiff had an organic brain disorder (encompassing the alleged impairments of learning disabilities and possible brain damage at birth), diabetes mellitus, and obesity, which were severe impairments, but which did not meet the requirements of a disabling impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Plaintiff's high blood pressure and high cholesterol were found not to be severe impairments, as they had improved with medication. The ALJ then reviewed the medical record, and mentioned Dr. Loughlin's letter and the 2003 vocational rehabilitation records recommending that Plaintiff "pursue full-time employment in the field of his choice." Tr. at 21.

The ALJ stated that he did not give the opinion of Plaintiff's treating physician, Dr. Worley, controlling weight because it was inconsistent with the rest of the medical records. The ALJ gave "average weight" to the results of Dr. Tichenor's psychological evaluation and diagnosis of Plaintiff's IQ. The ALJ gave "substantial weight" to Ms. Scott's physical RFC assessment. The ALJ also gave "substantial weight" to Dr. Altomari's mental RFC assessment. Tr. at 22.

The ALJ did not find Plaintiff's subjective allegations of his limitations fully credible in light of the medical record as a whole. Specifically, the ALJ found that Plaintiff's alleged limitations not credible because of the "range and quality of [Plaintiff's] daily activities," which included living alone and doing household chores. The ALJ found that Plaintiff had the following RFC: no exertional limitations; moderate

limitations in abilities to understand and carry out detailed instructions, work in coordination with others without being distracted, act appropriately with the public, maintain social behavior, and adhere to basic standards of neatness and cleanliness; and should limit exposure to unprotected heights.  Tr. at 22-23.

The ALJ accepted the opinion of the VE that Plaintiff could return to his past relevant work as a laborer, guard, commercial cleaner, and merchandise deliverer as substantiated by the record.  Thus, the ALJ concluded that Plaintiff's severe impairments did not prevent Plaintiff from performing his past relevant work.  Tr. at 23-24.

## STANDARD OF REVIEW AND STATUTORY FRAMEWORK

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005).  This "entails 'a more scrutinizing analysis'" than the substantial evidence standard.  Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)).  The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'"  Id.  (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).  Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'"  Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to  benefits, a claimant must demonstrate an inability to engage in

any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423 (d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities, including physical functions, such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; understanding, carrying out and remembering simple instructions; using judgment, responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

   In evaluating the severity of mental impairments, the ALJ must make specific findings as to the degree of limitation in each of the following functional areas:  activities

of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

Where a claimant cannot perform the full range of work in a particular category of work defined at 20 C.F.R. § 1567 (very heavy, heavy, medium, light, and sedentary) due to nonexertional impairments, such as pain or mental disorders, the Commissioner must present testimony by a VE to meet her burden at step five. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006).

## **DISCUSSION**

Plaintiff argues that the ALJ committed reversible error in not granting Dr. Worley's April 1, 2004 assessments, which were essentially consistent with Dr. Tichenor's May 15, 2003 findings, substantial, if not controlling weight, while instead granting Dr. Altomari's opinion substantial weight. Plaintiff contends that ALJ did not adequately explain his reasons for the different weights he according the various medical opinions in the record.

The weight to be given to a medical opinion is governed by a number of factors including the nature of the relationship, the consistency and supportability of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 404.1527(d)(2). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000).

Here, Dr. Worley was Plaintiff's treating physician and had been seeing Plaintiff for almost two years at the time she issued her assessments in question. The ALJ stated without elaboration that Dr. Worley's opinion was "inconsistent with the remainder of the

medical record." Tr. at 22. The Court's review of the record indicates that Dr. Worley's opinion was consistent with Dr. Tichenor's opinion. While Dr. Worley stated that Plaintiff had poor ability to relate to co-workers, deal with work stress, and maintain concentration, Dr. Tichenor found that Plaintiff's ability to interact socially was limited, and that he would not be able to concentrate and persist at tasks in a normal work environment. In addition, Dr. Worley's observation that Plaintiff "might have mild cognitive impairment" is supported by Dr. Altomari's statement that Plaintiff's claim that he had a cognitive disorder was fully credible.

When the ALJ questioned the VE on what jobs were available that were consistent with limitations as found by Dr. Altomari, the VE responded that Plaintiff's past relevant work at the rubber plant was consistent, as well as other jobs in the economy. However, when the ALJ added factors from Dr. Worley's opinion, and some from Dr. Tichenor's, the VE testified that no jobs exist taking into account those factors. The ALJ did not support his decision to value the opinion of Dr. Altomari, a non-treating, non-examining medical source, over that of Dr. Worley and Dr. Tichenor. Nor did the ALJ offer an explanation as to why he gave Dr. Tichenor's opinion only "average weight," and why he believed Dr. Altomari's opinion deserved "substantial weight."

Crediting Dr. Worley's and Dr. Tichenor's opinions more would have produced a different outcome. The Court does not believe that the evidence in the record, specifically, LOQW's conclusions based upon observations of Plaintiff during single-day placements at a job, is sufficient for the Court to determine that the opinions of Drs.

Worley and Tichenor were not due more weight than accorded them by the ALJ. Under these circumstances, the Court believes the proper course is to remand the case to the Commissioner for elaboration of the ALJ's reasoning and reconsideration thereof if warranted. See Singh v. Apfel, 222 F.3d 448, 452-53 (8th Cir. 2000) (reversing with directions to remand in part because the ALJ failed to give good reasons for rejecting a treating physician's opinion); Anderson v. Barnhart, 312 F. Supp. 2d 1187, 1194 (E.D. Mo. 2004) (failure to provide good reasons for discrediting a treating physician's opinion is a ground for remand) (citing cases). The Court also notes that the ALJ never discussed what weight, if any, should be given to Dr. Loughlin's letter.

## <u>CONCLUSION</u>

The ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act is not supported by substantial evidence on the record as a whole. On remand, the ALJ is to specifically explain why he weighted the opinions of Drs. Worley, Altomari, Tichenor, and Laughlin as he did, and for any further proceedings the Commissioner feels warranted.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and **REMANDED** for further consideration.

An appropriate Judgment shall accompany this Memorandum and Order.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 29th day of September, 2006